THE DE HAAN COMPANY *v.* UNITED STATES (No. 5271)*

United States Court of Customs and Patent Appeals, May 16, 1968

*Stein and Shostak* (*Marjorie M. Shostak, S. Richard Shostak*, of counsel).
*Edwin L. Weisl, Jr.*, Assistant Attorney General, *Andrew P. Vance*, Chief, Customs Section, *Sheila N. Ziff* for the United States.

[Oral argument April 2, 1968 by Mr. Shostak and Mrs. Ziff]

Before WORLEY, Chief Judge, and Judges RICH, SMITH, ALMOND, KIRKPATRICK**

ALMOND, Judge, delivered the opinion of the court:

We are concerned here with merchandise consisting of leather footwear manufactured in Guadalajara, Mexico and imported through the

---

*C.A.D. 936.
**Senior District Judge, Eastern District of Pennsylvania, sitting by designation.

Port of Laredo, Texas. The shipments are covered by eight protests consolidated in the trial below. The merchandise was classified under Par. 1530(e) of the Tariff Act of 1930 as footwear wholly or in chief value of leather with duty assessed at 20% ad valorem. The Customs Court sustained the classification and overruled appellant's claim that the goods are properly dutiable at 10% ad valorem under the provision for huaraches in Par. 1530(e) of the Tariff Act of 1930 as modified by the Mexican Trade Agreement T.D. 50797, 78 Treas. Dec. 190.

In seeking reversal of that decision, appellant contends that the three styles of footwear involved possess all the characteristic features of huaraches specified in the *Digests of Trade With Respect to Products on Which Concessions Were Granted to the United States* in the Trade Agreement between the United States and Mexico; that the footwear in issue is identical to the footwear held to be huaraches in *United States* v. *A. J. Taylor of Santa Fe, New Mexico*, 48 CCPA 97, C.A.D. 772, and *The De Haan Company* v. *United States*, 52 Cust. Ct. 354, Abs. 68563; that the *eo nomine* provision for huaraches added to the tariff by the Mexican Trade Agreement, without terms of limitation, includes huaraches in all forms; that the provision for huaraches constituted a *concession* granting a reduction in duty to importers, which must be *liberally* construed; and that the trial court erred in regarding this *concession* as an exception carved out of a general rule, and in construing it narrowly.

As noted, the merchandise was classified under paragraph 1530(e) which reads:

Boots, shoes, or other footwear (including athletic or sporting boots and shoes), made wholly or in chief value of leather, not specially provided for, 20 per centum ad valorem * * *.

and claimed under paragraph 1530(e), as modified by T.D. 50797 (in effect from January 30, 1943 to December 31, 1950), which is identical in language to that quoted above with the addition of

Huaraches _____ 10% ad valorem.

The sole issue before us is whether the imported merchandise qualifies as "huaraches" as that term is used in the modified statute.

The merchandise in issue consists of women's, misses', and children's leather-soled sandals from Mexico. Three kinds of footwear are in issue represented in this case by style 353, style 232, and style 253, exhibits of each style having been presented to the court for examination. Each exhibit is characterized by having the vamp, or upper of the shoe, stitched to the sole, as well as being attached by means of the laces which are woven to form the upper.

It is axiomatic that the collector's classification carries with it a presumption of correctness with a twofold burden resting on

appellant to show the collector's classification erroneous and to prove the correctness of its asserted classification. ■ Furthermore, we are not at liberty to disturb the factual findings below if they are substantially supported by the relevant facts adduced of record. Under the guidance of these well-established norms, we review the evidence which has been assayed by the Customs Court.

Incorporated below are the records in the *A. J. Taylor* case, supra, which incorporated the records in *United States* v. *Fuchs Shoe Corporation*, 41 CCPA 179, C.A.D. 547, and *United States* v. *Weigert-Dagen*, 39 CCPA 58, C.A.D. 464, which cases also concerned merchandise claimed by the importers to be huaraches.

J. M. Cortez, sales manager of Mexican Products Company, was introduced as a witness for appellant. He stated that his company imported leather footwear including the cheap grade of huaraches from Mexico from 1932 to 1942 and that he was familiar with Mexican leather footwear, having been to various parts of Mexico where such footwear is manufactured, including factories in Guadalajara, Cuernavaca and Oaxaca. He testified that he has dealt in merchandise represented by certain exhibits which were stipulated to be huaraches as well as the merchandise in issue, and that he bought and sold the merchandise in issue as huaraches.

Cortez was asked if he knew why the footwear in issue had the upper vamp stitched to the insole. He stated that this stitching was done for the purpose of improving the durability of the footwear. Cortez did not feel that the matter of stitching would take the footwear out of the category of huaraches, and that they were considered as huaraches in Guadalajara and in the United States. He testified further that quality of workmanship depended upon where the shoes were made in Mexico and that style 353 was offered to his company from 1943 to 1950.

Cortez, on cross-examination, stated that in 1932 he held the same position which he now holds, supervising salesmen in the United States and that he was never in charge of manufacturing or buying. He stated that he was in Guadalajara back in 1931–1932 and "I think I stopped in Cuernavaca" about 1932, remaining only "a couple of days." Contrary to his testimony in chief the witness stated that he didn't go to Oaxaca; that his trips to Mexico "were primarily vacation trips"; that he did not purchase footwear in Mexico and that purchases were made by a partner in his company.

With reference to the exhibits in issue, the witness stated that he did not remember seeing style 353 in the 1930's; as to style 232 he stated "we did not import this type" but had seen them in Mexico in the 30's; as to style 253 and style 353 Multicolor Nino, he stated

that they were made after 1943 and that he did not think that either of these latter styles were ever made before 1943. He further stated that his answer would be the same with respect to style 353 Natural.

Our review of this witness' testimony in toto, on direct, cross and redirect examination, is productive of the conclusion that it is vague, uncertain and vacillatory.

Appellant's witness Carlo P. Cantu, who has been a freight forwarder in Laredo, Texas since 1940, testified that he had never been in the business of buying or selling leather footwear. We find from our review of Cantu's testimony that the Customs Court, in its opinion, has made a fair summation thereof in its pertinent and relevant aspects. We adopt that summation as follows:

He testified that, during 1940–1950, his clients imported leather footwear and he had become familiar with it through inspecting and handling it for them. While he did not care what the goods were called, if he received "huaraches" and they were called "boots," he would look it up. During the 1940's he had handled several million pairs of Mexican leather shoes, sometimes as many as two railroad cars with 70,000 pairs, and had shipped them to [various American cities]. He went to Mexico several times a year to solicit business from huarache manufacturers and shippers. He had seen leather footwear which he knew as huaraches being manufactured in Guadalajara. Most of the footwear he handled was of the type that originated in Oaxaca; he had handled styles No. 232 and 353 only in small quantities. He became familiar with what he knew as a huarache through hearing people in Mexico and in the United States and those to whom he forwarded such articles calling them huaraches. In his understanding, this term referred to the footwear at issue as well as that which was the subject of the stipulated case. He had handled the former only in small quantities. He identified exhibit D from the *Taylor* case as a huarache from Oaxaca and said that the footwear he saw before 1943 was mostly of that type. He had seen style No. 353 and said that it was originally made with the vamp laced into the insole but that later it had been made in Guadalajara where it had been machine stitched on the outside. The reason for the machine stitching was the large demand because of the war. He had also seen other styles called huaraches, "especially for men to work with, very heavy sole, and instead of the upper woven like this, it just had three or four pieces of leather interlaced." He also knew there other styles from Mazatlan.

Joseph L. Kleinman, appraiser of merchandise at the port of El Paso, Texas, appeared on behalf of the United States.[1] The witness had been with the Bureau of Customs since September 1923, starting as an inspector at the port of Nogales, Arizona, becoming an appraiser at the same port in 1938 and an apprasier at El Paso in 1940. He has been involved with the footwear line since 1933. In his capacity as examiner, his work related to inspection and examination of leather footwear. His experience covered surveys and inquiries relating to various types of footwear, including huaraches. He interviewed peo-

---

[1] This witness previously testified on behalf of the importer in the *A. J. Taylor* case.

ple in the huarache trade, including manufacturers, shippers, importers and purchasers, since 1933, and examined their papers and purchase orders. He stated that a huarache is

* * * a flat soled type of footwear, leather, with or without a heel. If it has a heel, it is usually nailed on. The main part of the upper, usually called the vamp, is made of narrow strips of leather that are laced into the insole, and go over the top of the upper, laced to the other side of the insole. Sometimes those leather strips are woven together. Sometimes they are laced through a loose strip of leather that is in footwear.

The witness examined the exhibits in issue. He stated that style 353 is not a huarache because the solid leather piece through which the strips are laced is also stitched by machine to the insole and the outsole, and that the solid piece had actually become the main part of the vamp, or upper, and that if the laces are removed, the solid piece would be left because it was still stitched to the outsole and insole. He stated that style 353 Multicolor Nino, and style 353 Natural were not huaraches for the same reason, that style 253 was not a huarache as it had a solid piece for the vamp which was stitched down to the insole and outsole and that style 232 was not a huarache because it had two solid pieces forming the main part of the upper which were stitched down to the insole and the outsole. The witness was positive that he had never seen or heard of any item having the characteristics above described called a huarache prior to 1943, nor had he ever heard of or seen an item prior to 1943 with lacings going from one side of the vamp to the other which was also machine stitched. The witness distinguished the product in the *Taylor* case from that instantly involved, viz. style 353, in that the vamp here is stitched to the outer sole. He stated that there was nothing about this style which would indicate to him any particular area of Mexico from which it came. Most of the merchandise held to be huaraches in *Taylor* came from Mazatlan, near El Paso and the witness had handled many different styles at El Paso. He further stated that in Mexico most any style of open footwear was called huaraches and that those not so classified were called sandalias. As to the specific merchandise in issue, the importers, to his knowledge, did not call it huaraches, nor was it bought and sold in El Paso, or in other places in the United States, as huaraches and that it was occasionally invoiced that way inasmuch as the word was used for many different kinds of footwear. The witness stated that many items of footwear which came through the ports where he was examiner or appraiser which were called huaraches bore no relation to any of the items in issue; that the main characteristic of the huarache, as he knows it, is the appearance, shape and style of the vamp; that none of the items which had been stipulated by counsel to be similar to those in the *Taylor* case is machine stitched and that in all

of the stipulated items, the lacings goes from one side of the upper to the other side, this being the main feature of the vamp.

The opinion of the court below evinces a painstaking review of the decisions in the incorporated *Weigert-Dagen*, *Fuchs*, and *Taylor* cases, pointing out that the type of footwear here involved had been held in *Weigert-Dagen* not to be huaraches. Our examination of the *Weigert-Dagen* exhibits 45 and 46 discloses that they have the same lacing and stitching of the vamp to the insole that characterizes the merchandise at bar.

In all of these cases involving the importation of huaraches, the initial approach to resolution of the issue has been the definition or description found in the *Digests of Trade Data* issued by the United States Tariff Commission after the signing of the Trade Agreement with Mexico, wherein it is stated that

Huaraches are leather-soled sandals having woven-leather uppers laced to the insole. The insole is machine-stitched to the outsole, and the heel is nailed on. They are used principally by women and girls for beach and casual summer wear.

The trial court in *Weigert-Dagen* found that all of the exhibits did not conform to the above definition by reason of the fact that the uppers were only partly woven, or were not laced through the insole, or the insole was attached to the outsole by other than machine stitching, or because the heel was not nailed on. Eschewing the Tariff Commission definition, the court concluded that the term "huarache" meant footwear of a type generally worn in Mexico, the distinguishing feature being an upper wholly or substantially woven which was laced to the insole. It held that some of the articles before it were huaraches and some were not. We deem it pertinent to point out the rationale of the trial court relating to exhibits 45 and 46, wherein it stated:

* * * the uppers consist of solid pieces of leather containing slits through which are woven leather strips which are laced to the insoles. *The same stitching which holds the outsole to the insole also passes through the solid leather portion of the upper, so that it is held not only by the traditional lacing of the huarache but also by a sewing. These exhibits, however, meet all the tests of huaraches, and we do not believe that the extra sewing takes them out of that category.* [Emphasis added.]

This court (39 CCPA 58, C.A.D. 464) reversed, holding that the word "huarache" was an ambiguous word, that evidence as to its meaning was conflicting and that the definition contained in the *Digests of Trade Data*, 1943, which had been made available by the United States Tariff Commission to the negotiators of the Mexican Trade Agreement T.D. 50797, was the only convincing evidence of record of what the contracting parties intended that term to mean. It thereupon decided that none of the *Weigert-Dagen* merchandise complied with that definition.

The merchandise involved in the *Fuchs* case was stipulated to be the same in all material respects as that in *Weigert-Dagen*. The court, 41 CCPA 179, C.A.D. 547, reiterated the definition of huaraches adopted in Weigert-Dagen and held that the imported merchandise not having wholly woven uppers did not qualify as huaraches. The court stated:

> * * * all of the testimony and other evidence clearly established that a woven upper is an essential characteristic of huaraches. If the definition were so qualified as to satisfy the contention of the importer, it is not difficult to visualize footwear, the vamp consisting of a solid piece of leather attached to the insole by such a minute degree of weaving as to destroy one of the major characteristics of huaraches and thereby nullify that portion of the definition relating to "woven-leather uppers."

As noted by the Customs Court, a different result was reached by this court in the *Taylor* case, two judges dissenting, with the court limiting its decision to the merchandise before it. The merchandise in *Taylor*, 48 CCPA 97, C.A.D. 772, was described as follows:

> Exhibits 1 and 2 are representative of the imported merchandise. They are identical in construction but differ in size and color combinations. They are both without heels. The toe portion or vamp consists of a piece of slitted leather interwoven with fourteen flat leather thongs which are laced to the insole. The back quarter or counter consists of a slitted piece of leather machine stitched to the insole. Four flat thongs are interlaced into and extend completely around the counter, are interwoven on each side of the shoe with some of the thongs of the vamp, and are laced to the insole. The insole is machine stitched to the outsole. Each exhibit has an instep leather strap and buckle.

In *Taylor*, we find testimony that the huarache described in the *Digests of Trade Data* was a type known as the Oaxaca huarache and that described in exhibits 1 and 2 of the *Taylor* case was known as the Mazatlan huarache. The holding of the trial court, affirmed by a divided court on appeal, was based upon additional evidence offered by plaintiff in the *Taylor* case, even though the merchandise in *Taylor* was basically the same in construction as exhibit 2 in *Fuchs*. We deem it pertinent to note, however, that the court found that the testimony of the witnesses called to testify stood without a semblance of contradiction that the merchandise at issue was huaraches. Two of the three witnesses were disinterested parties. The United States produced no evidence to refute their testimony. The court found "most persuasive" the testimony of Joseph L. Kleinman quoting the appraisal of this witness made in the court below: "Undoubtedly the witness is one of the foremost witnesses on this subject throughout the United States," concluding that

> It is interesting to note that the Government offered no testimony to refute the uncontradicted statements made by this and the other witnesses. So it goes unchallenged.

This court adopted the trial court's summation of the evidence and stated:

If other types of sandals are presented to us in the future, the determination of whether they come under the Trade Agreement should be made upon the basis of the facts of the case and whatever evidence may be offered at that time.

Suffice it to say that, in our view, we have that situation presented by the instant record. As has been noted, the same Mr. Kleinman, testifying for the United States, stated without equivocation, that each and every exhibit representative of the merchandise at bar failed to qualify as a huarache prior to 1943. He explained in detail the features of the imported goods, stating why the footwear in issue are not huaraches, stressing the difference in construction and style of the vamp, and testifying that the vamp on a huarache is only laced and never machine-stitched to the insole. Relying on his observations, contacts and experience as a customs official at the border ports of Nogales, Naco and El Paso since 1924, he stated with positive directness that he had never seen any of the items in issue prior to 1943. He further pointed out the distinguishing features between the items in issue and those of the *Taylor* case which he had described as huaraches. Kleinman's positive testimony, backed by his years of experience with the subject matter in issue, stands, from an evidentiary viewpoint, in striking and overriding contrast to the testimony of appellant's witnesses.

On the basis of the testimony and the physical evidence afforded by this record, we agree with the Customs Court that:

This case is the opposite side of the coin from the *Taylor* case, in that the evidence here shows rather clearly, and we find, that the style here involved, with the vamp laced to the insole and also stitched down to the insole with the same stitching that fastens the two soles together, was not known to commerce before 1943. * * *

We further agree with the Customs Court that the trade agreement here under consideration should be interpreted as applying to articles imported as huaraches on and prior to the date of the agreement. The court said:

The *Taylor* case treated as controlling the fact that the style of huaraches there involved had been known and imported before the date of the trade agreement. We think the logical converse is that the concession does not apply to articles not imported as huaraches, on the date of the agreement, or similar to such articles. This conclusion finds some support in our appellate court's decision in *United States* v. *Tropical Craft Corp., etc.*, 42 CCPA 223, C.A.D. 598, wherein the addition of wedge heels to alpargatas was held to remove them from the reduced rate accorded them in the Argentine Trade Agreement, though the case is not exactly parallel. In a "new case" on similar merchandise, *Tropical Craft Corp.* v. *United States*, 45 CCPA 59, C.A.D. 673, the court reaffirmed its position

and held that the word "alpargata" had to be interpreted as of the date of the trade agreement in which it was named.

Appellant contends here, as it did below, that the merchandise under consideration does not differ in material aspects from the styles adjudicated as huaraches in the *Taylor* case. In our view the relevant exhibits and the Kleinman testimony clearly refute this contention. The record is convincing that huaraches on the date of the trade agreement were hand-laced to the sole while the instant merchandise has the vamps machine-stitched to the soles, and that the vamp of huaraches is structurally dependent on the woven laces, since they are the only connection of the vamp to the soles, while here the lacing forms only a minor portion of the vamp, consisting of wide solid pieces of leather stitched to the insole with lacing inserted largely for decorative effect.

Pertinent in this connection, with ample support of record, is the observation of the Customs Court that:

The evidence showed the stitching of the vamp to the soles had an important purpose, durability. It also makes the shoe stiffer. On the other hand, the change detracts from the ventilation of the true huarache, which must add to its comfort in warm climates. The addition of stitching to lacing of the vamp brings the product a great deal closer to the footwear protected by the higher rate, both in appearance and in function. In reducing the rate on the huarache to 10 percent, the negotiators undoubtedly had in mind that the product was so uniquely characteristic of Mexico that a scrupulous merchant would not advertise a product of another country as a huarache. Conversely, they had in mind a large volume of domestic production with which the true Mexican huarache would not compete. The digest says that the huarache is the product of "handicraft industry" and that "strictly similar merchandise is not produced in the United States." The instant merchandise was made to a United States buyer's specifications and was not native to Mexico; the extent of its competition with United States produced merchandise is not shown in the record but is surely more direct than that of a true huarache.

Appellant also relies on the well-established principle of law that where an article is provided for *eo nomine*, in a tariff provision, without terms of limitation, and without a shown legislative intent, *prior judicial decision*, or administrative practice to the contrary, all forms of the article are included.

We are not persuaded that this principle has application here. In *Weigert-Dagen* this court stated its agreement with the Customs Court that the word "huaraches" as found in he Trade Agreement with Mexico is an ambiguous word. The court said:

In cases where a word which is ambiguous and of doubtful meaning is used in a trade agreement it is proper for the court to resort to extraneous aids under the established rules of evidence in its effort to determine the meaning of the ambiguous and doubtful word. * * *

We have examined the line of cases cited and relied on by appellant. They have no application here in the face of *prior judicial decision* that the word "huarache" is ambiguous and doubtful in meaning in its context as used in the Mexican Trade Agreement, fully justifying, if not impelling, resort to extrinsic aids in the quest to ascertain which footwear the negotiators had in mind.

While we agree with appellant that the trade negotiators intended to include footwear "commonly known" as huaraches within the embrace of the Mexican Trade Agreement, we are not persuaded that the appellant has borne the burden incumbent upon it to establish that the imported merchandise was so known and embraced.

We consider it significant that the *Digests of Trade Data*, the press release of December 23, 1942, as well as the 1946 *Digest* and the 1948 *Summaries* describe merchandise substantially different from the merchandise at bar. These publications state that huaraches have uppers laced to the insole and that the insole is machine-stitched to the outsole. The record is devoid of a single publication describing huaraches which have vamps machine-stitched to the insole.

We must therefore agree with the Customs Court that appellant "has not proved to our satisfaction that the imported articles, or articles similar in all material respects, actually were produced in Mexico, or imported, at any date before 1943." We therefore feel that appellant's attempt to distinguish between an "exception" and a "concession" is of no import.

The judgment of the Customs Court is *affirmed*.

KIRKPATRICK, J., took no part in the decision of this case.